# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 17 CR 762 |
| | ) | |
| RYHEAM CROCKETT, | ) | Judge John Z. Lee |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION & ORDER

On May 13, 2017, Chicago Police officers seized a firearm from Ryheam Crockett's pants, after he had fled from police and became caught on a wrought-iron fence. Shortly thereafter, Crockett was charged and indicted for possession of a firearm after having previously been convicted of a felony in violation of 18 U.S.C. § 922(g)(1). Crockett has now moved to suppress the firearm, arguing that it was obtained in violation of his Fourth Amendment rights. In addition, he has moved to suppress certain post-arrest statements that he made, contending that he did not validly waive his *Miranda* rights before giving them. The Court held a two-day evidentiary hearing and oral argument on the motion to suppress. For the reasons that follow, the motion [51] is denied.

## Background[1]

In the afternoon of May 13, 2017, gunshots rang out in the vicinity of the 10th District Chicago Police station in the North Lawndale neighborhood. Def.'s Mot. at 2, ECF No. 51; Hr'g Day 1 Tr. at 6, 126, ECF No. 74. Crockett was walking nearby at 21st Street and Christiana Avenue. Def.'s Mot. at 1–2. When the gunshots sounded, Chicago Police Officers Ryan Stec, Brian Collins, Joel Soto, and Nicholas Mukite were walking from the 10th District Station to the parking lot together. *Id.* at 2; Gov't's Resp. Def.'s Mot. at 1, ECF No. 52. They all entered into an unmarked police car, and Officer Stec drove them toward the location where they believed the shots had come from—21st Street and Christiana Avenue. Def.'s Mot. at 2.

In the process of doing so, the officers ended up driving north on South Christiana Avenue (the wrong way, incidentally, as South Christiana Avenue is a one-way southbound street) and stopped near 1950 S. Christiana Avenue. *Id.*; Gov't's Resp. at 2. The officers testified that it took them between fifteen and thirty seconds to get from the police station to 21st and Christiana. Hr'g Day 1 Tr. at 11, 206.

When they arrived at 1950 S. Christiana, a group of people was standing near the house, including Crockett. Def.'s Mot. at 1–2; Hr'g Day 1 Tr. at 11, 30, 71, 127–28. Crockett testified that, when the officers arrived, he was standing on the porch of the house. Hr'g Day 1 Tr. at 129. Each of the officers, however, testified that Crockett was on the sidewalk in front of the house, and that he began making his way

---

[1] The following facts are based upon the representations in the parties' briefs and the evidence presented at the hearing held on December 7, 2018, and December 12, 2018. The facts are undisputed except where otherwise noted.

up the steps to the porch when he saw the officers. *Id.* at 12–13, 72–74, 184. Then, according to Officer Stec, Crockett "looked in [the officers' direction, turned, and manipulated a dark what appeared to be weighted object in the rear of his waistband." *Id.* at 12. Officer Stec testified that, at that time, it was sunny outside, there were no cars blocking his vision of Crockett, and he was driving no more than five miles per hour. *Id.*

Once he saw Crockett, Officer Stec alerted his fellow officers to Crockett, saying something to the effect of "dude in white" or "that guy over there with the white shirt." *Id.* at 13, 72, 183–84. Officer Collins states that, when he looked at Crockett, he saw him "making movements in the rear right of his waistband, in his underwear, rearranging something." *Id.* at 74. Officer Soto, too, says he noticed a "large dark object" in Crockett's waistband, outside of his shirt. *Id.* at 185–86.

Crockett, for his part, acknowledges that he was carrying a gun in his pants, but testified that (1) the gun was in the front of his pants, not the rear, and (2) he was wearing a shirt that covered his waistband area. *Id.* at 128–29, 170–75.

Officers Collins, Mukite, and Soto then got out of the car and started walking toward Crockett on the porch of the house. Def.'s Mot. at 2. They did not announce themselves as officers or ask Crockett to stop. *Id.* According to Crockett, one of the officers went onto the porch and tried to grab him. *Id.* at 2; Hr'g Day 1 Tr. at 131. Crockett then realized the officers were coming for him, and responded by "looping over the banister" of the porch and jumping into the gangway between 1950 S. Christiana and the neighboring house. Hr'g Day 1 Tr. at 14–15, 75, 132. A wooden

3

fence or door closed off the entrance to the gangway, so Crockett had to jump over the fence to proceed down the gangway. *Id.* at 16–17, 75.

At this point, Officer Collins went after Crockett, jumping into the gangway behind him. *Id.* at 75–76. Crockett says he "walked" to the back of the gangway, *id.* at 132, but Officer Collins testified that Crockett ran away from him down the gangway, *id.* at 76. At that point, Officer Collins says he saw a "very large L-shaped object" in Crockett's "pant leg"—pants that were "very tight." *Id.*

When Crockett arrived at the rear of the gangway, he encountered another wooden fence or door blocking the exit. *Id.* Crockett began climbing that fence, and Officer Collins grabbed his legs to try and detain him. *Id.* at 76–77, 133–34. Crockett, however, was "able to kick and break free, or wiggle and break free," and fell over to the other side of the fence. *Id.* at 77, 134. Crockett says the impact of the fall was hard, causing the gun to slide down the inside of his pants. *Id.* at 160.

Once he was on the other side of the fence, Crockett began a "light jog" across an alley. *Id.* at 159–60. Officer Collins followed Crockett over the wooden fence and saw Crockett "regaining his footing" and continuing to run. *Id.* at 78. Officer Collins continued chasing Crockett, who ran or jogged across the alley to a third, wrought-iron fence. *Id.* at 78, 90. Crockett tried to climb this fence as well, but Officer Collins caught up to him. *Id.* at 78. Officer Collins grabbed Crockett's shirt to try and detain him or pull him off the fence, *id.*, and Crockett became caught on the top of the fence by his pants or belt. *Id.* at 90–91, 101, 135.

4

The other officers soon arrived at the scene. *Id.* at 18, 78. Officer Soto testified that he believed he was the first officer to catch up to Crockett, and that he, like Officer Collins, tried to grab Crockett and pull him down off the fence, but was unable to do so because Crockett was stuck. *Id.* at 186–87.

Officer Stec saw an "outline of what [he] believed to be a firearm" in Crockett's jeans, so the officers cut open the jeans using a knife and recovered a "Glock 40 semi-automatic handgun with an extended magazine." *Id.* at 18. The gun was recovered from Crockett's left pant leg. *Id.* at 96.

According to the officers, Crockett, who was still dangling from the fence, became "not compliant" with verbal commands. *Id.* at 18, 46. Accordingly, Officer Soto says he used multiple "open hand strikes" to Crockett's torso. *Id.* at 189–91. Crockett, who says he had been moving because the fence was digging into his stomach, offered a different account of the events, testifying that Officer Soto hit him in the head three or four times with a police radio. *Id.* at 135–36, 138–40.

Police later took a photo of Crockett, where he clearly appeared to be bleeding from "somewhere around his ear and the back of his head down his neck and down his check and stomach." *Id.* at 56. Officer Soto, however, denied having hit Crockett in the head. *Id.* at 192, 198–99; Hr'g Day 2 Tr. at 14–15, ECF No. 73. During the hearing, the defense also presented body-worn camera and cellphone footage purporting to show the hits to Crockett's head. *Id.* When shown these videos, Officer Soto maintained that he did not hit Crockett in the head. *Id.*[2]

---

[2] In the body-worn camera footage during the time of the alleged hits, Crockett's head is not visible; rather, the most that can be seen of his body is from his upper arms down.

5

Crockett was handcuffed and taken to the 10th District Station. Hr'g Day 1 Tr. at 20. Officer Stec testified that he and Sergeant Robert Garza interviewed Crockett in a processing room, while Crockett was handcuffed to a wall. *Id.* at 21, 56–57. Officer Stec says that Sergeant Garza read Crockett his *Miranda* rights from memory, and that Crockett waived those rights and agreed to talk to the officers. *Id.* at 21–22. Crockett then made a statement: "I keep that bitch on me for protection. Why are you fucking with me? They shooting down the block." *Id.* at 22. Officer Stec testified that Crockett declined to be recorded during the interview. *Id.* at 22–23. Officer Stec also acknowledged that neither he nor Sergeant Garza asked Crockett to sign a written statement indicating that he understood or waived his *Miranda* rights. *Id.* at 57. Officer Stec later typed Crockett's statement into his case report, but he did not "go over" the statement with Crockett or have him sign or initial it, once it was written. *Id.* at 58–60. Sergeant Garza testified at the hearing consistently with Officer Stec's testimony. *See id.* at 113–22.

Crockett's version of events is drastically different. He agrees he was taken to an interview room and handcuffed to a wall. *Id.* at 144. But he says officers never read him his *Miranda* rights, and in fact, no officers ever came to interview him at all. *Id.* At one point, two officers came in the room to give him paper towels for his bleeding, and he asked them for medical attention. *Id.* at 144–45. But Crockett says

---

Officer Soto can be seen holding a police radio and making upward motions with the hand holding the radio. The cellphone footage is taken from some distance away, and the video is blurry and shaky. It shows a group of officers surrounding Crockett on the fence and moving around.

6

that he never talked to any officer about a gun, and that the first time he had ever seen Sergeant Garza was at the hearing in this case. *Id.* at 145–46. Crockett denies having made any statement to police. *Id.* at 148.

Based on these statements, as well as the Glock semi-automatic handgun recovered from his pant leg, Crockett was charged by indictment on November 16, 2017, with possession of a firearm as a felon in violation of 18 U.S.C. § 922(g).

## Analysis

Crockett has moved to suppress the firearm found during the search and seizure of his person, as well as the statement he allegedly made at the 10th District Station. For the reasons that follow, the Court denies Crockett's motion to suppress.

### I. Motion to Suppress the Firearm

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects[ ] against unreasonable searches and seizures." U.S. Const. amend. IV. As a general matter, a search is unreasonable under the Fourth Amendment if it is conducted in the absence of a warrant supported by probable cause. *See, e.g., United States v. Parker*, 469 F.3d 1074, 1077 (7th Cir. 2006) (citing *Stanley v. Henson*, 337 F.3d 961, 963 (7th Cir. 2003)). In turn, when officers conduct a search that is unreasonable under the Fourth Amendment, the exclusionary rule generally requires suppression of any evidence obtained from the search. *See, e.g., Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016); *United States v. McGraw*, 571 F.3d 624, 628 (7th Cir. 2009).

7

There are, however, several well-established exceptions to these rules. In particular, officers are authorized to search the person of an arrestee, as well as the area in his control (a "search incident to arrest"). *Birchfield v. N. Dakota*, 136 S. Ct. 2160, 2175–76 (2016). Whether such a search is valid depends on the validity of the arrest. And probable cause to arrest exists when the "totality of the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, [to] believe[e], in the circumstances shown, that the suspect has committed, or is committing, or is about to commit an offense." *United States v. Paige*, 870 F.3d 693, 699–700 (7th Cir. 2017) (internal quotation marks and citation omitted).

The Fourth Amendment also permits a law-enforcement officer to conduct a warrantless investigatory stop of a person when the officer reasonably suspects that a crime has occurred. *See D.Z. v. Buell*, 796 F.3d 749, 754 (7th Cir. 2015) (citing *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968)); *United States v. Shields*, 789 F.3d 733, 744 (7th Cir. 2015). "Such stops, referred to as *Terry* stops, need not be supported by probable cause; rather, they are permissible as long as officers have a reasonable articulable suspicion that criminal activity is afoot." *D.Z.*, 796 F.3d at 754 (internal quotation marks omitted). Reasonable suspicion requires "only 'a minimal level of objective justification.'" *United States v. Hill*, 818 F.3d 289, 294 (7th Cir. 2016) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). To meet this requirement, an officer must have "more than a hunch" that a crime has occurred; "he must be able to point to specific facts that suggest that a stopped individual has committed, was

8

committing, or is about to commit an offense." *D.Z.*, 796 F.3d at 754. In determining whether an investigatory stop was supported by reasonable suspicion, courts consider the "totality of the circumstances" surrounding the stop. *Hill*, 818 F.3d at 294 (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

As an initial matter, the parties have some disagreement about the standard—probable cause or reasonable suspicion—that is relevant to this case. They agree, however, that Crockett was not stopped or seized *at all* before he became caught on the third and final fence.[3] It was on that fence that officers cut open Crockett's jeans to retrieve the firearm and placed him in handcuffs. Accordingly, since no stop occurred before that point, the Court concludes that the only legal question that needs resolving is whether there was probable cause for a search and seizure at the moment Crockett became caught on the third fence.

The Court agrees with defense counsel, however, that the question of reasonable suspicion is not irrelevant. Rather, as defense counsel explained, what occurred in this case was essentially a failed *Terry* stop that instead became an arrest and search. Analyzing the facts and circumstances that led the officers to attempt a *Terry* stop—and then to chase Crockett and ultimately arrest him—is necessary to the probable cause analysis. Here, the Court concludes that the officers had

---

[3] Defendant's motion to suppress frames his arguments in the context of reasonable suspicion for a *Terry* stop. At oral argument, however, defense counsel confirmed that it is the defense's position that Crockett was not stopped or seized in any sense before he got stuck on the third fence.

9

reasonable suspicion to conduct a *Terry* stop, which then turned into probable cause for an arrest once Crockett thwarted the stop and fled from the officers.

A number of factors support this conclusion. First, Crockett does not dispute that, minutes before the officers pulled up at 1950 S. Christiana, gunshots had gone off in the area. The officers contend that they drove to the area where they believed the shots had originated. Although Crockett argues that there is evidence the shots were fired elsewhere, *see* Def.'s Mot. at 2, there is nothing in the record that indicates that the officers believed that to be the case at the time of the events in question.

Then, when the officers pulled up to 1950 S. Christiana, three of them testified that they saw Crockett adjusting something in his rear waistband that could have been a firearm. Crockett disputes this fact in a variety of ways.

First, he points to his own testimony that the gun was in the front of his waistband, not the rear, and that in any event his shirt was covering his waistband so that officers would not have been able to see a gun no matter where it was. The Court finds Crockett's testimony in this regard extremely confusing and implausible. He spent several minutes attempting to explain to the Court how the gun was positioned, even standing up to demonstrate. *See* Hr'g Day 1 Tr. at 171–75. He stated that the "weapon was aimed like kind of down" in the front of his pants, but then explained that the muzzle was *not* pointed down, because "that would have made the clip stick out where the officer would have been able to see" it. *Id.* at 172. Instead, he said the clip of the gun was "down in [his] pants leg," *id.*, which seemingly would have meant that the muzzle was aimed up or at least to his side. But, several minutes

10

later, he said that the muzzle was *not* across his belt with the clip hanging down because "it wouldn't have fell the way that it fell" if that had been the case. *Id.* at 173. Then, confusing matters further, he claimed that the muzzle was indeed hanging down with the clip across the front of his pants. *Id.* at 174. So, in a matter of minutes, Crockett gave multiple conflicting accounts of how the gun was positioned in his front waistband.

In contrast, Officers Stec, Collins, and Soto each testified that they saw Crockett adjusting an object in his rear waistband as he was walking toward the porch of 1950 S. Christiana. The defense raises questions about each of the officers' credibility as to these statements. In particular, the defense points to the fact that Officer Collins did not claim to have seen an object in Crockett's waistband either in the written report or in his interview with prosecutors. Further, defense counsel questions the plausibility of Officer Collins's claim that he saw Crockett adjusting an object in his *right* rear waistband, when the gun was later recovered from Crockett's *left* pant leg. The Court does not find either of these points persuasive. First, Officer Collins explained that the report was a "summary" rather than a "line-by-line of everything that happen[ed]." Hr'g Day 1 Tr. at 95. And the Court does not find that his failure to mention his observation materially undermines his credibility as to what took place. Finally, there is a plausible explanation for the gun's movement from Crockett's right rear waistband to his left pant leg—it likely fell down toward the left as he was running and jumping over multiple fences. Crockett himself

acknowledged that the gun fell down into his pant leg from the impact of his fall off of the second fence.

The defense offers other reasons to discredit the officers' testimony generally. For instance, defense counsel asserts that Officer Soto denied seeing Crockett bleeding from the head, despite photographic evidence to the contrary. *See* Hr'g Day 1 Tr. at 198–99. But just because Crockett was bleeding does not mean that Officer Soto necessarily saw it, even when he was walking Crockett to the police car. The defense also points to the officers' delay in turning on their body cameras, contending that the cameras should have been turned on before the chase began. But each of the officers acknowledged that they did not turn their cameras on immediately, and given the pace at which events transpired, the is delay understandable.

Finally, the defense attempted at the hearing to show that Officer Soto was lying about hitting Crockett in the head with a police radio. But the Court finds the various video evidence inconclusive. And although the circumstances of Crockett's head bleeding are murky (and the Government has offered little in the way of explanation), there is no evidence that Crockett was not wounded in some other way, such as from his struggle on and fall from the second fence.[4]

Considering the totality of the facts in the record, the Court finds credible the testimony of Officers Stec, Collins, and Soto that they each heard gunshots nearby,

---

[4] The defense has also suggested that the officers are biased because Crockett has filed a civil lawsuit against them that may subject them personally to punitive damages. But lawsuits against police officers are common, and the Court does not believe that the threat of civil damages unduly biased the officers' testimony in this case.

headed toward the area, and less than a minute later saw Crockett adjusting an object in his rear waistband as they pulled up to 1950 S. Christiana. And the Court finds credible the testimony of Officer Collins that he saw an "L-shaped object" in Crockett's pant leg while chasing Crockett between the first and second fences. These observations, combined with the gunshots officers had heard only minutes before, provided at least reasonable suspicion for a brief *Terry* stop. *See United States v. Richmond*, 641 F.3d 260, 262 (7th Cir. 2011) (finding reasonable suspicion where officers observed a "conspicuous bulge" above the defendant's waistband that was consistent with a revolver handle).

But, as Crockett and the Government agree, a *Terry* stop did not occur. Instead, Crockett ran away from the police officers, jumping two fences and attempting to jump a third. In fact, Crockett not only attempted to evade the officers, but was even briefly in an officer's grip before "kick[ing]" or "wiggl[ing]" away. *See* Hr'g Day 1 Tr. at 77. The Government contends that these facts, combined with all of the other facts described earlier, moves the needle from reasonable suspicion to probable cause.

Crockett, however, advances several arguments that the officers nevertheless lacked probable cause to support his arrest and search, or even reasonable suspicion for a *Terry* stop. First, the defense notes that there was a group of people near 1950 S. Christiana, and that there was no testimony that any of these people seemed frightened or concerned when the officers pulled up. This fact, defense counsel argues, is inconsistent with the officers' testimony that they responded to the shots

13

fired in less than a minute. If Crockett had just fired a weapon less than a minute earlier, defense counsel queries, wouldn't the people nearby have had some reaction? The Court is not persuaded by this speculative reasoning. It is impossible to know what was in the minds of the people standing near Crockett on South Christiana Avenue as none of them testified. And in any event, the officers would not be expected to immediately stop investigating a known danger just because they did not see anyone looking visibly afraid. The officers heard multiple gunshots, and then saw a man with a large, dark, weighted object in his waistband less than a minute later in the area where they believed the shots originated. At a minimum, the officers had reasonable suspicion to initiate a *Terry* stop with that information. *See Richmond*, 641 F.3d at 262.

The defense also argues that the Court *cannot* consider the fact that the officers saw what looked like a firearm in Crockett's pants, when assessing reasonable suspicion or probably cause. Counsel points out that the law has changed in recent years with respect to the ability to carry guns on public streets in Illinois and in Chicago. *See, e.g.*, *McDonald v. City of Chi.,* 561 U.S. 742 (2010) (striking down Chicago's handgun ban as unconstitutional); *Moore v. Madigan*, 702 F.3d 933, 934 (7th Cir. 2012) (striking down Illinois's prohibition on carrying a concealed firearm as unconstitutional). It is no longer *per se* illegal to carry a concealed gun in Illinois, they argue, and so the mere presence of the "large object" or "L-shaped object" in Crockett's waistband cannot support reasonable suspicion or probable cause to stop him. *See also United States v. Watson*, 900 F.3d 892, 895–96 (7th Cir. 2018) (holding

that an anonymous tip about the "presence of guns" did not create reasonable suspicion because "carrying a firearm in public is permitted with a license in Indiana"); *see also People v. Horton*, 78 N.E.3d 489, 498 (Ill. 2017) ("[T]he possible observation of a handgun is not in itself, without any other evidence of a crime, sufficient to provide an officer with probable cause for arrest."), *vacated on other grounds,* 93 N.E.3d 1065 (Ill. 2017).

But there was more here than just the presence of a possible gun. Here, the officers had heard shots fired nearby, and the person they saw with the gun-like object immediately jumped a fence to get away from them. This case is therefore nothing like *Watson*, where the officers were following an anonymous tip to find "men . . . seated inside [a] car with no guns in sight." *Watson*, 900 F.3d at 896. Whereas in *Watson* there was merely a speculative "possibility of unlawful use of a gun," *see id.*, here there was the likelihood of an ongoing emergency. Nor is this case like *Horton*, in which an officer merely "had a hunch" that the defendant was carrying a firearm and saw a chrome metal object. 78 N.E.3d at 500. The additional facts known here to the officers supported, at first, reasonable suspicion to attempt to detain Crockett.

Finally, the defense argues that Crockett's flight from the officers does not support probable cause, as individuals have a "right to ignore the police and go about [their] business." *Wardlow*, 528 U.S. at 124–25. Crockett argues that this right to avoid the police is even stronger when the police themselves provoke the flight. Several courts of appeals have accepted such an argument. *See, e.g., United States v.*

*Jeter*, 721 F.3d 746, 753–54 (6th Cir. 2013) (agreeing that certain types of provocation might make a defendant's flight less suspicious); *United States v. Franklin*, 323 F.3d 1298, 1300 (11th Cir. 2003) ("We accept that officers cannot improperly provoke—for example, by fraud—a person into fleeing and use the flight to justify a stop."). This Court does not find the distinction between "provoked" and "unprovoked" flight "terribly helpful," *see Jeter*, 721 F.3d at 754, as every flight can be considered "provoked" in some sense, whether by the officers' presence or by their actions.

In any event, Crockett's flight from the officers cannot be viewed in isolation. Rather, the Court must look to the totality of circumstances before it. *See Paige*, 870 F.3d at 699–700. And, here, after based upon the totality of circumstances, the Court concludes that the officers first had reasonable suspicion to briefly detain Crockett, when they heard gunshots, proceeded to the area from which they believed the shots originated, and saw a man with a large, dark object in his waistband only minutes later.

That reasonable suspicion ripened into probable cause when, upon seeing the officers coming toward him, Crockett jumped one fence, then another, and then tried to scale a third to get away. Crockett's forceful evasion of Officer Collins on the second fence—kicking and wiggling away from Officer Collins's grip—also supports this conclusion. Given all of these facts together, the Court finds that the officers possessed probable cause to believe that Crockett had committed, or was about to commit, a crime involving a firearm.

Crockett's motion to suppress the firearm evidence is denied.

## II. Motion to Suppress the Post-Arrest Statement

Next, Crockett seeks to suppress evidence of the oral statement he gave to Officer Stec and Sergeant Garza after his arrest. He contends that he never received *Miranda* warnings and certainly did not waive his rights.

When a defendant makes a post-arrest statement, the government bears the burden of proving that the statement was made following a voluntary, knowing, and intelligent waiver of *Miranda* rights. *United States v. Jackson*, 300 F.3d 740, 748 (7th Cir. 2002). The absence of a signed waiver is not dispositive; rather, the validity of a waiver depends on the totality of circumstances. *See id.* A waiver may be "inferred from the defendant's understanding of his rights coupled with a course of conduct," such as continuing to speak to officers, "reflecting his desire to give up his right to remain silent and have the counsel of an attorney." *Id.* (internal citation omitted). A defendant may "waive his right to remain silent even if he 'does not know the specific questions the authorities intend to ask.'" *Collins v. Gaetz*, 612 F.3d 574, 588 (7th Cir. 2010) (quoting *United States v. Ruiz*, 536 U.S. 622, 629 (2002)).

The only argument Crockett makes against the validity of his *Miranda* waiver is his contention that the entire encounter was fabricated. This issue boils down to a credibility contest between Crockett, on the one hand, and Officer Stec and Sergeant Garza on the other hand. The Court finds the accounts of Officer Stec and Sergeant Garza more credible. As an initial matter, their stories were consistent and plausible, and established affirmatively that Crockett received *Miranda* warnings and knowingly waived them. In fact, defense counsel pointed out several ways in which

Crockett's interview could have been documented more fully—for example, the interview was not recorded, and Crockett was not asked to sign a written waiver or to sign his statement—and both officers readily acknowledged these details and offered plausible and consistent explanations.

On the other hand, Crockett's testimony was not credible or plausible. In addition to the reasons provided earlier to question Crockett's credibility, this is not a case where conviction hinges on a defendant's oral statements. As the Government points out, the police already had everything they needed to charge Crockett with a crime—video footage of officers retrieving a firearm out of Crockett's pant leg and Crockett's criminal record. Given the strength of that evidence, it is difficult to see why Officer Stec and Sergeant Garza would take the risk of completely fabricating their interaction with Crockett.

Defense counsel briefly argued during oral argument that the Government's failure to ask Sergeant Garza to identify Crockett in court is proof that, as Crockett alleges, Sergeant Garza never interviewed him. But Sergeant Garza offered testimony that essentially amounted to an identification. He testified that on May 13, 2017, he arrived at the back of a residence where officers were removing a firearm from an individual stuck on a fence—a person whom he now knows to be Crockett. Hr'g Day 1 Tr. at 111–12. Then, Sergeant Garza testified, he interviewed Crockett at the 10th District Police Station. *Id.* at 113. The government's omission to ask Sergeant Garza to separately identify Crockett during the suppression hearing does not carry the weight that defense counsel suggests.

18

Because the Court finds Officer Stec and Sergeant Garza's testimony credible with respect to the *Miranda* warnings and statement, Crockett's motion to suppress his post-arrest statement is denied.

## **Conclusion**

For the reasons stated herein, the motion to suppress [51] is denied.

**IT IS SO ORDERED.**          ENTERED 2/19/19

_____
**John Z. Lee**
**United States District Judge**